## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

BENITA BLESSING,

      **Plaintiff,**

        v.

OHIO UNIVERSITY,

      **Defendant.**

Case No. 2:09-CV-0762
JUDGE EDMUND A. SARGUS, JR.
MAGISTRATE JUDGE MARK R. ABEL

### OPINION AND ORDER

This matter is before the Court for consideration of Defendant Ohio University's Motion for Summary Judgment (Doc. 59). For the reasons that follow, Defendant's motion is **GRANTED**.

### I. FACTUAL BACKGROUND

Plaintiff Benita Blessing ("Blessing") brings this action against Defendant Ohio University ("University"), alleging gender discrimination, hostile work environment, and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Blessing's claims emanate from the University's decision not to renew her teaching contract.

In 2001, the University employed Blessing as a one-year contract instructor. (Blessing Dep. 11.) In the fall of 2002, Blessing was hired into a tenure-track faculty position as an assistant professor in the history department. (Miner Dep. 59–60.)[1] Tenure-track faculty members are considered probationary until the end of their fifth year, when they "go up for tenure" in an attempt to receive a career-length appointment. (Goda Dep. 12, 16, June 17,

---

[1] Steven Miner served as chair of the history department from 2000–2005.

2010.)[2]  In the meantime, probationary faculty are subject to a reappointment process consisting of a series of one-year appointments renewed on an annual basis.  (Goda Dep. 48, June 17, 2010.)  To merit reappointment, Blessing had to demonstrate progress in three general categories: (1) teaching and advising; (2) scholarship; and (3) service and collegiality.  (Blessing Dep. 170; Goda Dep. 51, June 17, 2010.)  A committee comprised of five members of the history department, called the Peer Evaluation Committee ("PEC"),[3] together with the department chair, would annually review each probationary faculty member.  Based on that review, the chair would draft a PEC evaluation containing both a written evaluation of the individual's performance as well as a numerical rating for each of the three performance areas.  Ratings were based on a nine-point scale, with the following numerical meanings: 1–3 inadequate performance; 4–5 adequate performance; 6–7 effective performance; 8–9 superior performance.  (Def.'s Mot. Summ. J., Ex. 26.)  The primary purpose of the PEC review was to determine the salary increase each faculty member would receive for the following academic year, as faculty members achieving the highest scores received the largest share of the raise pool.  (Miner Dep. 20; Goda Dep. 49, June 17, 2010.)  The PEC review was also to provide untenured faculty with an update as to their progress toward tenure.  (Miner Dep. 16, 19.)

Blessing's teaching contract was renewed on an annual basis from 2002 until 2007.[4]  During that time, there was little dispute that her scholarship was adequate.  (Miner Dep. 78.)  However, there were repeatedly noted issues with regard to Blessing's teaching and service.  (Miner Dep. 79–84.)  In 2003, the PEC gave Blessing a teaching rating of 6.28, noting that many

---

[2] Norman Goda succeeded Miner as chair of the history department in 2005.

[3] The PEC committee consisted of five elected faculty members, usually three who had tenure and two who did not. (Goda Dep. 51, June 17, 2010.)  Faculty members were ineligible to serve on the PEC committee if they were in their first year of employment, their last year of employment, or if they had already been elected for two consecutive years.  (Id.)

[4] Blessing did not go up for tenure in her fifth year due to the receipt of two fellowship awards, where she spent two years away from the University.  (Blessing Dep. 13, 20.)

of her students viewed her as disorganized and unprepared for class, as well as having inappropriately discussed "personal and private matters in the class forum." (Def.'s Mot. Summ. J., Ex. 27 at 1.) The PEC recommended that Blessing focus on increasing her level of course organization and on maintaining a "more professional distance" from her students, while not sacrificing the individual contact that she was trying to establish with them. (*Id.* at 2.) With respect to Blessing's service, the PEC found that Blessing's service load in 2003 was among the lightest in the department and the service rating of 1.90 reflected the committee's judgment that her record amounted to a "disservice." (*Id.*) The PEC stated that Blessing had improperly interfered in the department's job searches and continued to do so after being warned to back away, then told "a number of falsehoods to various people that appeared designed to cover [her] actions or to cast blame on others." (*Id.*) The PEC also found that Blessing "suggested two Lazaroff speakers [for a University event], promised to invite them to campus, failed to do so and then constructed various tales to explain [her] failures, persisting in spinning new tales when confronted with concrete evidence." (Def.'s Mot. Summ. J., Ex. 27 at 2; Ex. 31, 32, 33.)

In 2004, Blessing's teaching and service scores were raised to a 7.30 and 5.60 respectively, to reflect the PEC's sense that she had improved in both areas. (Def.'s Mot. Summ. J., Ex. 27 at 3.) However, the PEC highlighted an interview that Blessing had done with the *Chronicle of Higher Education* in which she was quoted as claiming that, as a single, female faculty member she was required to carry a disproportionate service load in comparison with her married colleagues. (*Id.*) The article led to a joint letter from Blessing's colleagues rejecting that claim, and a subsequent letter of explanation from Blessing. In that explanation, Blessing claimed that the author of the article had distorted her comments and told her colleagues that she would write to the author and the *Chronicle* to set the record straight. However, when contacted,

both the editor and author of the article stood by the characterization of Blessing's remarks as cited in the article. According to them, no letter from Blessing of the kind promised in her response to her colleagues' joint letter ever appeared. (*Id.*) The PEC cited the incident as an "unfortunate affair," explaining that the negative and inaccurate publicity associated with the article undermined the department's efforts in trying to rebuild its graduate program. (*Id.*) Also in the spring of 2004, several of Blessing's tenured colleagues—Norman Goda (who would later become chair of the department), Katherine Jellison, Sholeh Quinn, Walter Hawthorne, and Patrick Griffin—had gone to see then-Dean of the College of Arts and Sciences, Leslie Flemming, regarding Blessing's relationships with the other members of the department. (Goda Dep. 117–123, June 17, 2010.) The group informed Dean Flemming that they felt the relationship between Blessing and the department has reached a point "where it simply could not be rescued," and asked Dean Flemming to consider the option of severing Blessing's employment relationship. (Goda Dep. 121, June 17, 2010.) Dean Flemming rejected the idea, making clear that she was not going to undertake any action of the sort suggested. (Goda Dep. 122, June 17, 2010.) Rather, she told the group that they would have to find a way to integrate Blessing into the department. (*Id.*)

Blessing's teaching and service scores did not improve in 2005, when she was given a 6.30 for teaching and a 5.10 for service. (Def.'s Mot. Summ. J., Ex. 27 at 4.) In her review, the PEC voiced concerns regarding the unusually high grading in her classes, with 61–69% of her students receiving grades in the A range. (*Id.* at 5.) In addition, Blessing's student evaluations again reflected a sense of disorganization in the classroom. (*Id.*)

Blessing's scores further regressed in her 2006 review when she was given a 5.85 for teaching and a 3.45 for service. Again, her student evaluations reflected complaints of

4

disorganization and mentioned that Blessing made "inappropriate, confused and factually inaccurate remarks" in addition to being chronically late for class. (*Id.* at 7.) The PEC also found that the grades that Blessing awarded—"the highest in the department"—were not credible as earned by her students. (*Id.*) In addition, questions were raised as to the content of her classes. The PEC found that in a class titled "Twentieth Century France," "an inordinate amount of the reading [came] from books on fashion, cinema, and the like." (*Id.*) The PEC noted, for example, that the reading for the week spent on World Wars I and II was on Parisian fashion. It was unclear as to whether major postwar themes were discussed (such as decolonization), although two weeks were spent on French cinema. (*Id.*) Student evaluations mentioned that they had taken the course "expecting a more balanced look at the history of France." (*Id.*) Similar criticisms were also made regarding her Modern Germany class. Concerning her low service rating, the PEC noted that Blessing's work on a committee newsletter—her only substantial service task for the department—did not reach completion in satisfactory time. (*Id.* at 8.) Blessing was commended, however, on receiving the University Professor Award that year, an annual award given to five University faculty members nominated and selected by students in appreciation for their teaching. (Ogles Dep. 75–76.) According to Blessing, Goda commented to her that the award was as much a popularity contest as an award for excellence in teaching. (Blessing Dep. 298–99.) At one point, Goda also expressed his relatively low opinion of the award to Benjamin Ogles, Dean of the College of Arts and Sciences. (Ogles Dep. 75; Goda Dep. 80, Jan. 20, 2011.)

Finally, in her 2007 PEC evaluation, Blessing was given her lowest teaching rating of 5.10 and a service rating of 3.60. Again, the PEC noted issues with organization and clarity in her courses, and also mentioned that students had made very critical comments of her favoring

certain students. (Def.'s Mot. Summ. J., Ex. 27 at 10.) In addition, while the PEC noted Blessing's work with two student organizations, student advising, and completing the newsletter on schedule, the committee cited collegiality as a concern, stating that she needed "to be more conscious of the impact of [her] actions on colleagues and students." (*Id.*) Specifically, the PEC was referring to an incident where Blessing had replaced another faculty member as the advisor of a student group known as the Ohio University History Association ("OUHA"), which resulted in the embarrassment of her colleague, David Curp, the same quarter he was up for tenure.[5]

In February 2008, Blessing appealed her 2007 PEC evaluation by filing a formal grievance with the entire PEC Committee, Dean Benjamin Ogles (who had replaced Dean Flemming), Goda (now chair of the department), and Katherine Ziff, then-Director of the University's Office of Institutional Equity, asking for a second evaluation. (Ogles Dep. 135; Def.'s Mot. Summ. J., Ex. 16, 17.) In addition to outlining the reasons she believed her scores were too low, Blessing claimed that the evaluation reflected "a continued disregard and dismissal of female faculty's concerns regarding gender bias in the department that extends from faculty to students." (Def.'s Mot. Summ. J., Ex. 16.) The PEC re-evaluated her review, and while they chose to raise her scholarship score slightly from a 7.55 to a 7.75, they did not change her scores for teaching or service. (Def.'s Mot. Summ. J., Ex. 18.) Blessing then appealed the PEC's re-

---

[5] Curp had been appointed advisor in the spring of 2007 by the department chair, Norman Goda. Blessing subsequently met with a student member of the OUHA, who expressed interest in having Blessing as an advisor. (Blessing Dep. 32–33.) Shortly thereafter, Blessing approached Curp at least once about co-advising the OUHA, who declined. (Blessing Dep. 35.) In the fall of 2007, the OUHA held its first meeting of the year, with Curp in attendance as advisor. After Curp left the meeting, the OUHA officers apparently elected Blessing as their advisor, ousting Curp. (Blessing Dep. 32; Def.'s Mot. Summ. J., Ex. 11.) Blessing claims that she only agreed to serve as advisor if the OUHA's president sent Goda an e-mail stating that the association would like Curp and Blessing to serve as co-advisors. (Blessing Dep. 42.) Goda later informed Blessing that he was disappointed with her role in the incident, advising her that she could have handled the situation in a more appropriate manner by either declining the offer to advise the OUHA or discussing the issue with Curp or Goda. (Def.'s Mot. Summ. J., Ex. 15.) Blessing claims that she heard several rumors over the next few months that some members of the history department believed she had taken over the club in an attempt to convert it into a feminist history association. (Blessing Dep. 72–73.) Upon hearing these accusations, Blessing registered a concern that she was the victim of gender bias with the University's Office of the Ombudsman, the Office of Institutional Equity, and the director of the Women's Center. (Blessing Dep. 75–76, 81, 83, 96.)

evaluation to Dean Ogles and Kathy Krendl, the University Provost. Provost Krendl recommended that a new PEC comprised of faculty members from outside the history department be formed to re-evaluate Blessing. (Def.'s Mot. Summ. J., Ex. 29.) However, such a review in isolation was deemed unworkable by Goda, as chair of the department. In a letter to Provost Krendl, Goda explained that because each faculty member's PEC rating determined their salary level for the following academic year, many of the other faculty members in the history department wanted a re-evaluation by the ad-hoc committee as well. (Def.'s Mot. Summ. J., Ex. 30.) In light of the potential disruption to the department, an ad-hoc committee was viewed as untenable. Moreover, all three tenured members of the committee who had provided the original 2007 reviews for the department had resigned from service on the PEC, concerned that their professional impartiality had been impugned. (*Id.*)

On March 7, 2008, Blessing filed a formal grievance with the University's Office of Institutional Equity, alleging sexual harassment within the history department. (Def.'s Mot. Summ. J., Ex. 24.) In her grievance, Blessing reiterated her belief that she was not fairly evaluated and stated that her gender resulted in her receiving a lower PEC score than her colleagues. (*Id.*) Blessing alleged that the department had engaged in sexual harassment in a number of ways: (1) giving her improperly low annual merit evaluations; (2) remarking in a way that demonstrated attitudes evidencing a bias against women and women's studies; (3) criticizing her teaching style by telling her to use a more lecture-oriented approach; (4) discouraging students from taking her classes; (5) leaving romance novels in her mailbox; and (6) unfairly chastising her for assuming advisor duties of the OUHA because of her gender. (*Id.*; Blessing Dep. 183.) Blessing provided several examples of alleged remarks and actions taken by her colleagues which, she alleged, constituted evidence of a hostile work environment: her male

7

colleagues telling undergraduates not to take her courses because they were "fluff" and that she was a "femi-Nazi,"[6] Goda's comment that there was "only one way to teach military history," and her colleagues rolling their eyes at one of her suggestions during a faculty meeting. (Def.'s Mot. Summ. J., Ex. 24.) She also claimed that "a small number of students used their student evaluations as a form of sexual harassment (since students are aware that evaluations are read by other colleagues and influence merit pay and promotion)." (*Id.*) Blessing highlighted a negative student evaluation in which the student called her a "fucking bitch," and that she was "probably frigid." (*Id.*) Blessing contended that "such evaluations needed to be addressed as a departmental problem," since those sorts of comments were "clearly viewed by [her] colleagues as evidence of poor teaching." Blessing further contended that her colleagues "allowed sexually abusive comments by students to serve their intended purpose: to intimidate [her] into not teaching women's history and to demonstrate that [her] sex and gender [were] appropriate targets of abuse." (*Id.*) Blessing also maintained that she had attempted to discuss her concerns directly with Goda, who dismissed her concerns and allegedly informed her that he did not "have enough zeros" behind his paycheck to address gender discrimination issues. (*Id.*) After a thorough review, however, the Office of Institutional Equity found that none of Blessing's allegations rose to the level of sexual harassment and that many of her allegations could not be substantiated. (Def.'s Mot. Summ. J., Ex. 25.)

Concurrently with Blessing's appeal of her 2007 PEC evaluation, the Seven-Year Review of the history department was taking place, a periodic review of the status of a given department involving reviews by both internal and external individuals. (Goda Dep. 169, June 17, 2010;

---

[6] Blessing makes this claim in her formal grievance with the Office of Institutional Equity but fails to point to the specific male colleague or decision-maker at the University who made the statement. At the summary judgment phase, Blessing is obligated to "identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006). She has not done so here. Without knowing the author of the statement, the Court has no way to determine if the speaker was in any way part of the decision-making process leading to the non-renewal of her teaching contract.

Scanlan Dep. 44.)[7]  At that time, Blessing was serving on the Program Review Committee, a university-wide committee that provided oversight for the Seven-Year Reviews. (Scanlan Dep. 48–50.) At Program Review Committee meetings, Blessing repeatedly raised concerns that the history department was improperly conducting its review.  She specifically alleged that the reviewers were not given proper access to all members of the faculty and that the department was not holding open forums for the reviewers. (Scanlan Dep. 48–50; Def.'s Mot. Summ. J., Ex. 22.) Blessing claimed that Goda had intentionally excluded her from participating in the review process because Goda knew she had complaints about gender issues in the department. (Blessing Dep. 207–09.)  Ultimately, however, the Program Review Committee concluded that the history department had conducted a sufficient review.

In the midst of Blessing's appeal of her 2007 PEC evaluation and the concerns regarding the Seven-Year Review, in early 2008, three students approached Goda and Sholeh Quinn, a female associate professor, claiming that they had been experiencing some problems with Blessing. (Goda Dep. 106–07, 264–66, June 17, 2010.)  The concerns raised by the students regarding Blessing included: (1) her previewing exam material with selected students from a course; (2) her pressuring of students to attend events outside of the classroom; (3) her delegating to a student the task of distributing course-related materials because she was too "busy" to do it herself; (4) her directing of students to attend her class on Veterans Day while the University was officially closed; (5) her delegating to a student her departmental service assignment of producing the department newsletter; (6) her initiating phone calls with students at "all hours of the day and night"; (7) her calling a student out of work to let her dog out; (8) her insistence that students invite her to their personal parties; (9) her demand that a student baby-sit for Blessing's friends when the student was studying for an exam; (10) her making unwanted

---

[7] Thomas Scanlan has served as Associate Dean of the College of Arts and Sciences since November 2007.

(non-sexual) contact with a student; (11) her inviting students to hold a party at her house while she was not present; (12) her appearing at parties with underage drinkers who were her students; (13) her drinking to the point of inebriation at student parties and making students uncomfortable; and (14) on at least one occasion, her becoming so inebriated while drinking with students that a student had to drive her home. (*Id.*)

In his role as chair of the department, Goda raised these issues with Blessing in a May 8, 2008 memorandum, stating that he was concerned about her alleged "troublesome and unprofessional behavior" in relation to students, particularly undergraduate students. (Def.'s Mot. Summ. J., Ex. 18.) Blessing responded to the memorandum on May 13, 2008, denying each of the allegations and calling them "baseless." (Def.'s Mot. Summ. J., Ex. 36.)

On May 15, 2008, Dean Ogles informed Goda and Blessing that he was convening an ad hoc committee to evaluate the allegations against Blessing. (Def.'s Mot. Summ. J., Ex. 37.) The ad hoc committee was composed of Thomas Scanlan, Associate Dean of the College of Arts and Sciences; Judith Grant, Professor of Political Science and Director of Women's and Gender Studies; and Jennifer Hines, Associate Professor in the Department of Chemistry. (Def.'s Mot. Summ. J., Ex. 38.) Dean Ogles also suspended the activities of the OUHA, as many of the allegations regarding Blessing's conduct involved undergraduate members of the association. (Def.'s Mot. Summ. J., Ex. 37.)

The ad hoc committee conducted a preliminary investigation into the students' complaints, including an analysis of e-mails, a review of the summaries of the interviews of the students by Goda and Quinn, and interviews with the three students who had initially come forward. (Def.'s Mot. Summ. J., Ex. 38; Scanlan Dep. 13.) The committee found the three students' statements to be credible, as there was no motive for them to be untruthful—they had

received good grades in Blessing's class—and they were able to recall events in explicit detail. (Def.'s Mot. Summ. J., Ex. 38.)  The committee also spoke with a fourth student, the president of the OUHA, who came forward in support of Blessing.  The committee, however, found this student less credible than the other students for two reasons: (1) the student was living with Blessing at the time (in a non-romantic manner); and (2) the student's defense of Blessing mirrored the language of Blessing's response to Goda's memorandum.  (*Id.*)  Moreover, the student was unable to refute the allegations of the other three students. (Def.'s Mot. Summ. J., Ex. 38.)

On June 25, 2008, the ad hoc committee issued a report of their evaluation, stating that the investigation turned up evidence of "serious breaches in professional ethics" and warranted further investigation.  (*Id.*)  After the ad hoc committee submitted its report, the allegations against Blessing were submitted for investigation to the Professional Ethics Committee ("Ethics Committee"), a standing committee within the College of Arts and Sciences.[8]  The Ethics Committee conducted an investigation into the allegations, reviewing documents assembled during the previous investigation and interviewing 22 individuals, including Blessing, her spouse, current and former students, faculty, administrators, and members of the ad hoc committee. (Def.'s Mot. Summ. J., Ex. 39.)  The Ethics Committee noted in its report that it was unable to interview some individuals because of their unwillingness to speak with the committee. (*Id.*)

On May 7, 2009, the Ethics Committee voted 4 to 2 to formally reprimand Blessing for her conduct.  While the committee found that some of the allegations as set forth by the ad hoc

---

[8] The Ethics Committee consisted of: Steve Hays, Associate Professor in the Department of Classics and World Religion; Mara Holt, Associate Professor in the Department of English; Freve Pace, Field Education Director in the Department of Social Work; Mark Halliday, Professor in the Department of English; Diane Ciekawy, Associate Professor in the Department of Sociology and Anthropology; and Julie Suhr, Associate Professor in the Department of Psychology.  (Def.'s Mot. Summ. J., Ex. 39.)

committee were unsubstantiated, it found that others were completely or partially substantiated.

(*Id.*) The committee's findings included the following:

I. Introductory Statement

Based on the evidence presented to us during our investigation, all six members of the Professional Ethics Committee conclude that Dr. Blessing fostered close personal relationships with students in which she failed to recognize the potential for negative impact on students, and she failed to take steps to prevent negative impact on students. In the judgment of four members of the Professional Ethics Committee, these behaviors can be described as a failure to adhere to a professor's proper role as intellectual guide and mentor and therefore warrant a reprimand.

Examples of negative impact on students, which were substantiated during our investigation and agreed upon by all six members of the committee, include the following:

A. Dr. Blessing's behaviors tended to create confusion for students about appropriate student/faculty roles by her frequent socializing with students, including drinking, frequently having students over to her home, allowing students frequent access to (and even temporary residence in) her home, involving students in her emotional struggles, and failure at times to correct the illusion that her relationships with students were relationships of equals (peer to peer).

B. Dr. Blessing's interactions with students tended to create a burden of friendship in which students perceived a need to care for her emotionally, particularly in regard to defending her position versus her perceived adversaries in the Department of History. Dr. Blessing included students in departmental disputes and informed them of inappropriate details regarding faculty interactions in the department. Some students did not know how to extricate or distance themselves from this friendship, which was made all the more difficult by their confusion about faculty/student roles (see above).

C. Dr. Blessing's close relationships with students tended to create a student perception of pressure to do inappropriate things for Dr. Blessing, or to do things the student later had reason to regret, such as driving her home when she was incapacitated, doing academic tasks that led to a perception of favoritism for one student versus others in a course, and requesting student support of her in her current departmental difficulties, particularly when students were still in a position to be evaluated by her. This perception was also complicated by the role-confusion Dr. Blessing created in her students.

12

(*Id.*)  Writing separately, the majority noted that there was "clearly strong evidence of a problematic pattern of behavior related to confusion about appropriate faculty/student roles," and that the pattern of "excessive closeness and intensity in [Blessing's] relationships with a small set of students (from five to ten students at a time)" had extended for at least two years.  (*Id.*)  In addition, the majority found that "the ambivalence, confusion, anxiety, and even fear . . . built up in the minds of some students due to their over-involvement with [Blessing], reached a level that can fairly be called harm to the students' development and progress as students at Ohio University."  (*Id.*)  The majority recommended that Blessing seek out counseling and continuing education to understand appropriate student-teacher dynamics and her own behavior in the events that lead to her reprimand, and that she be suspended from teaching until she had done so.  (*Id.*)

Dean Ogles concurred with and adopted the Ethics Committee's recommendations. (Def.'s Mot. Summ. J., Ex. 41.)  He suspended Blessing from teaching until she had complied with the Ethics Committee's recommendations regarding counseling and continuing education. (*Id.*)  Blessing then appealed the Ethics Committee's decision and recommendations, as well as Dean Ogles's acceptance of those recommendations, to Provost Krendl.  On May 28, 2009, Provost Krendl adopted the findings of the Ethics Committee and Dean Ogles, denying Blessing's appeal.  (*Id.*)  Blessing subsequently appealed Provost Krendl's decision to the Professional Relations Committee of the Faculty Senate.[9]  (Def.'s Mot. Summ. J., Ex. 42.)  On October 6, 2009, the ten-member Professional Relations Committee also denied Blessing's appeal, finding that there was no merit to the allegations she had made about the impropriety in the procedural aspects of the investigation.  (Def.'s Mot. Summ. J., Ex. 43.)  Thereafter, Blessing

---

[9] The Professional Relations Committee of the Faculty Senate consisted of: Steve Patterson, Doug Bolon, Charlotte Elster, Sherrie Gradin, Bernadette Heckman, Tim Heckman, Jim Lein, Robert Knight, Ella McCown, and Rudy Pasic. (Def.'s Mot. Summ. J., Ex. 43.)

made her final level of appeal to the University President, Roderick McDavis. (Def.'s Mot. Summ. J., Ex. 44.) On October 20, 2009, President McDavis denied her appeal, sustaining the recommendations of the Ethics Committee and stating that he found the "thoughtful recommendation the committee made" to be "reasonable, in light of the investigation and findings they made concerning the allegations." (Def.'s Mot. Summ. J., Ex. 45.)

Amidst the University's investigation into Blessing's allegedly unethical conduct, the Promotion and Tenure Committee ("PTC") met to consider re-appointment for the non-tenured members of the department.[10] (Goda Dep. 48, June 17, 2010.) The PTC consisted of all full-time tenured faculty members in the history department, whether associate professors or professors.[11] (Goda Dep. 31–32, June 17, 2010.) In May and June 2008, the PTC met three times to discuss whether to renew Blessing's teaching contract. (Def.'s Mot. Summ. J., Ex. 46.) The PTC voted unanimously to recommend non-renewal of her contract. (*Id.*) In reaching that decision, the PTC acknowledged that Blessing had met expectations with respect to her scholarship, but noted significant issues with her teaching and service. (*Id.*) Nonetheless, the PTC identified Blessing's ethical and professional demeanor with students and lack of collegiality with other faculty as reasons behind the decision, stating that her "behavior . . . [was] so serious that the College of Arts and Sciences [was] conducting a full investigation into [her]

---

[10] Prior to 2008, the history department had used the annual PEC evaluation as both the basis for salary increases and tenure-track performance issues. (Goda Dep. 50–58, June 17, 2010.) After Goda became chair, he determined that the department's reappointment process did not conform to the University's faculty handbook. Accordingly, Goda appointed a subcommittee of the department to change the process so that untenured faculty members would receive a separate progress-toward-tenure letter, consistent with the provisions of the faculty handbook. (Goda Dep. 64–65, June 17, 2010.) In February 2008, the new process, drafted by the subcommittee, was presented to and voted on by the entire department. (Goda Dep. 74–75, June 17, 2010.) The task of updating untenured faculty as to their progress toward tenure became the responsibility of the Promotion and Tenure Committee, and would be based on the faculty member's dossier and discussion among committee members. (*Id.*)

[11] Thirteen faculty members served on the PTC in the year 2008: Steve Miner, Patrick Barr-Melej, John Brobst, Alfred Eckes, Marvin Fletcher, William Frederick, Katherine Jellison, Kevin Mattson, Jaclyn Maxwell, Paul Milazzo, Chester Pach, Sholeh Quinn, and Kevin Uhalde. (Def.'s Mot. Summ. J., Ex. 55.)

14

conduct." (*Id.*) A letter informing Blessing of the PTC's decision was sent to her on June 9, 2008 by Goda, who had not taken part in the PTC's vote. (Def.'s Mot. Summ. J., Ex. 46, 55.)

Blessing immediately requested an appeal of the PTC's recommendation. (Def.'s Mot. Summ. J., Ex. 47.) In the fall of 2008, the PTC again voted 13-0 to deny the appeal. (Def.'s Mot. Summ. J., Ex. 47, 48.) In early 2009, the PTC voted a third time to unanimously reaffirm its decision not to renew Blessing's teaching contract. (Def.'s Mot. Summ. J., Ex. 48.)

The PTC's recommendation was then forwarded to Dean Ogles, who delayed a final decision. (Ogles Dep. 10.) Typically, a faculty member whose contract was not renewed was given a "terminal year" of employment during which to seek new employment. (*Id.*) As the University's deadline for contract renewals had already passed by June 2008, if Dean Ogles had accepted the initial recommendation of the PTC, Blessing's terminal year of her contract would have been the academic year starting in September 2009. Given the lengthy timeframe between the PTC's initial recommendation, the deadline for action, and the then-pending ethics allegations against Blessing, Dean Ogles delayed making a final decision. In the meantime, Blessing proceeded to e-mail colleagues in the history field, seeking their intervention on her behalf with the Dean, Provost, and President of the University. (Blessing Dep. 335–38; Def.'s Mot. Summ. J., Ex. 49, 50.) When Dean Ogles became aware of this campaign, he asked Blessing to cease sending such e-mails because she was "distorting the truth and leaving out important facts about the processes that [were] occurring," which verged on "defaming the [history] department and Ohio University." (Def.'s Mot. Summ. J., Ex. 49.)

On May 15, 2009, Dean Ogles sent Blessing a letter accepting the department's PTC recommendation not to renew her contract. (Def.'s Mot. Summ. J., Ex. 48.) As with her annual PEC evaluations and the ethics investigation against her, Blessing sought relief through a number

of levels of appeal. She asked Dean Ogles to reconsider his decision, which he denied on June 22, 2009. (Def.'s Mot. Summ. J., Ex. 51.) Thereafter, Blessing appealed to the new University Provost, Pam Benoit, who found no merit in her appeal and upheld Dean Ogles's decision on October 19, 2009. (Def.'s Mot. Summ. J., Ex. 52.) Finally, Blessing appealed Provost Benoit's decision to the Promotion and Tenure Committee of the Faculty Senate, which also denied her appeal. (Def.'s Mot. Summ. J., Ex. 53.) In June of 2010, Blessing's final appointment contract with the University expired.

Blessing filed a charge with the Equal Employment Opportunity Commission ("EEOC") on July 15, 2008 claiming discrimination and harassment by the University on the basis of sex and retaliation. On June 3, 2009, the EEOC issued a right-to-sue letter. Blessing filed this action on September 1, 2009. The University subsequently moved for summary judgment on all claims asserted by Blessing.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the University's motion for summary judgment, this Court must "view all facts and any inferences in the light most favorable" to Blessing, the nonmoving party. *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009); *see also Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A motion for summary judgment should be denied if "there is a genuine need for trial," which turns on "whether the evidence is such that a reasonable jury could return a verdict for the plaintiff." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002).

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading." *Viergutz v. Lucent Technologies, Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010). Instead, the party opposing summary judgment "must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine need for trial." *Id.*

## III. DISCUSSION

The University moves for summary judgment on all claims asserted by Blessing, namely Blessing's allegations that the University: (1) discriminated against her on the basis of gender; (2) subjected her to a hostile work environment on the basis of sex; and (3) retaliated against her. The University also contends that Blessing failed to exhaust her administrative remedies—a statutory prerequisite to maintaining claims brought under Title VII—and is thus barred from bringing forth her Title VII claims. The Court will address each of these arguments in turn.

### A. Exhaustion of Administrative Remedies

Title VII makes it unlawful for an employer to discharge an individual or otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's sex. 42 U.S.C. § 2000e-2(a)(1); *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 63 (1986). In designating the procedure for challenging prohibited employment discrimination under Title VII, Congress gave initial enforcement responsibility to the EEOC. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (Title VII "specifies with precision the perquisites that a plaintiff must satisfy before filing suit."). An employee alleging employment discrimination in violation of the statute must first file an

17

administrative charge with the EEOC within a certain time frame after the alleged wrongful act or acts.[12] *See* 42 U.S.C. § 2000e-5(e)(1).

As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge. *See id.* This rule serves the dual purpose of giving the employer information concerning the conduct about which the employee complains, as well as affording the EEOC and the employer an opportunity to settle the dispute. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974). Hence, allowing a Title VII action to encompass claims outside the reach of the EEOC would deprive the employer of notice and frustrate the EEOC's investigatory and conciliatory role. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010). At the same time, because aggrieved employees—rather than attorneys—usually file charges with the EEOC, their *pro se* complaints should be construed liberally so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge.[13] *See Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006). As a result, "whe[n] facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998).

The University contends that Blessing failed to exhaust her administrative remedies and is thus barred from bringing forth her claims under Title VII. Specifically, the University asserts that Blessing failed to reference any events related to her gender discrimination and retaliation claims in the EEOC charge; mainly, the non-renewal of her teaching contract. (Def.'s Mot.

---

[12] "An individual must file a charge [of discrimination with the Equal Employment Opportunity Commission ("EEOC")] within the statutory time period and serve notice upon the person against whom the charge is made. In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days. A claim is time barred if it is not filed within these time limits." 42 U.S.C. § 2000e-5(e)(1).

[13] Blessing filed her EEOC charge without assistance from an attorney. (Blessing Aff. ¶ 3.)

Summ. J. 22.)  Therefore, the University argues, Blessing's claims with regard to those allegations should be dismissed.  (Def.'s Mot. Summ. J. 22.)

To the contrary, Blessing's EEOC charge clearly and explicitly sets forth all three of her claims for gender discrimination, hostile work environment, and retaliation, thereby providing the EEOC and the University with the requisite notice.  In filing her EEOC charge, Blessing specifically checked the boxes on the form indicating "sex" and "retaliation" as the motivations for discrimination against her.  (Complt. Ex. A.)  Moreover, in describing the alleged discrimination, she states in the narrative portion of the form, "[d]uring my employment I believe I have been subjected to harassment because of my gender, female . . . and I believe the harassment has continued." (Complt. Ex. A.)  This language would have put the EEOC and the University on notice that Blessing was alleging sexual harassment.  Therefore, Blessing's EEOC charge did provide clear notice as to the three claims she sought to bring against the University.

Furthermore, it is clear that the EEOC investigated, and the University was aware of, Blessing's claim that the non-renewal of her teaching contract was the result of gender discrimination.  *See Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) ("purpose of [exhaustion] requirement is to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation.").  As part of its investigation, the EEOC submitted a series of questions to the University, which included the following: "Did you discriminate against the Charging Party based on sex, female, when you subjected her to different terms and conditions of employment?" (Blessing Aff. ¶ 4, Ex. 4.)  The University's Position Statement in response indicates that it was aware that the relevant issue—whether the non-renewal of her teaching contract was based on gender or retaliation—was, in fact, incorporated into the EEOC's

investigation. (Blessing Aff. ¶ 4, Ex. A5.) The University devotes much of its Position Statement justifying the non-reappointment decision, and acknowledges that Blessing "claims that because she is female and teaches non-traditional courses that she is being singled out because of her sex...." (Blessing Aff. ¶ 4, Ex. A5.) It also states that "at the end of the day, you will see the results of a review process by the Promotion and Tenure Committee that recommended her non-renewal based on valid and professional reasons, not based on discrimination or retaliation." (Blessing Aff. ¶ 4, Ex. A5.) Based on this statement alone, it is clear that the issue of whether Blessing was non-reappointed on the basis of gender or retaliation was central to the EEOC's investigation and provided the University with the requisite notice.

Blessing filed her EEOC charge well within the applicable limitations period.[14] The allegations in the EEOC charge were sufficient to put the EEOC and the University on notice that Blessing perceived herself to be a victim of gender discrimination, sexual harassment, and retaliation. Because Blessing properly exhausted her administrative remedies, the Court declines to dismiss Blessing's claims on this basis.

## B. Disparate Treatment

Next, the University argues that it is entitled to summary judgment on Blessing's disparate treatment claim. A Title VII claim may be made on the grounds of "disparate treatment," which essentially alleges that the "employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin." *Teamsters v. United States*, 431 U.S. 324, 335–36 n.15 (1977). A plaintiff may establish discrimination by either direct or circumstantial evidence. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006). The plaintiff does not contend that she has presented direct evidence of

---

[14] Blessing received a letter from the University informing her that she would not be reappointed on June 9, 2008. (Compl. at 5.) Blessing filed her EEOC charge on July 15, 2008. (Compl. Ex. A.)

discrimination.  Absent such direct evidence, a claim of discrimination under Title VII is "analyzed pursuant to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), as modified by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)." *Bartlett v. Gates*, 421 Fed. Appx. 485, 488 (6th Cir. 2010).  Under the *McDonnell Douglas-Burdine* burden-shifting analysis, a plaintiff who lacks direct evidence of discrimination may establish a prima facie case of discrimination through circumstantial evidence by showing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position lost; and (4) she was treated less favorably than a similarly-situated individual outside the protected class. *See Clayton v. Meijer, Inc.*, 382 F.3d 605, 610 (6th Cir. 2002); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).  A plaintiff making the prima facie showing by a preponderance of the evidence is entitled to a presumption of discrimination. *Colvin v. Veterans Admin. Med. Ctr.*, 390 Fed. Appx. 454, 457 (6th Cir. 2010) (citing *Burdine*, 450 U.S. at 254).

The burden of production then shifts to the defendant, which can overcome the presumption by showing a "legitimate nondiscriminatory reason" for its actions. *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802).  If the defendant's explanation is "legally sufficient to justify a judgment" in its favor, the plaintiff must demonstrate that the defendant's stated reason for the adverse employment action was merely a "pretext for discrimination." *Burdine*, 450 U.S. at 253.  The ultimate burden of proving the defendant's intent to discriminate, however, remains with the plaintiff at all times. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

21

### 1. Prima Facie Case

It is undisputed that Blessing meets the first three elements of her prima facie case: (1) she is female; (2) her teaching contract was not renewed; and (3) she was qualified for the position she held. (Pl.'s Resp. to Def.'s Mot. Summ. J. 36; Def.'s Mot. Summ. J. 23–24.) Thus, the only remaining inquiry is whether there is a non-protected employee similarly situated to Blessing who received more favorable treatment.

"To be found similarly situated, the plaintiff and his proposed comparator must have engaged in acts of 'comparable seriousness.'" *Colvin*, 390 Fed. Appx. At 458 (quoting *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002)). In assessing the relative seriousness of the employees' acts, a court may consider "whether the individuals have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Colvin*, 390 Fed. Appx. at 458 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). While there need not be an "exact correlation" between the plaintiff and the non-protected employee who was treated more favorably, the plaintiff must demonstrate that he and his proposed comparator are "similar in all of the *relevant* aspects." *Colvin*, 390 Fed. Appx. at 458 (quoting *Ercegovich*, 154 F.3d at 352). The court must "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Colvin*, 390 Fed. Appx. at 458 (quoting *Ercegovich*, 154 F.3d at 352).

Blessing maintains that David Curp, a male faculty member in the history department who was hired into a tenure-track position at the University in 2001, is similarly situated. She notes that, although Curp's performance was similar to Blessing's with regard to teaching,

22

scholarship, and service, Curp was continually reappointed to his position as an assistant professor until the 2007–2008 academic year when he was granted tenure. (Pl.'s Resp. to Def.'s Mot. Summ. J. 37.) Blessing provides evidence in the form of student and PEC evaluations that she and Curp were arguably similarly situated with regard to their teaching and service. (Pl.'s Resp. to Def.'s Mot. Summ. J. 37–38, Ex. C, D.)

However, the record contains no evidence that Curp was ever investigated or reprimanded for unethical conduct. Blessing, nevertheless, contends that the issue of whether the ethics investigation factored into the University's decision to not reappoint her is one for the jury. She claims that three of the thirteen tenured faculty members had decided against renewal before the ethics investigation even began. (Pl.'s Resp. to Def.'s Mot. Summ. J. 40–41.) Therefore, she argues, a reasonable jury could conclude that the University's non-reappointment decision was made well before the ethics investigation began, and accordingly the ethics investigation could not have factored into its decision. (Pl.'s Resp. to Def.'s Mot. Summ. J. 41.)

The record also lacks evidence that Curp has a similar record of issues with collegiality. Blessing, however, asserts that the University uses the term "collegiality" as a "mask for gender discrimination." (Pl.'s Resp. to Def.'s Mot. Summ. J. 42.) She insists that the University's argument—that Curp is not similarly situated because he did not have similar issues with collegiality—"relies heavily on the University's subjective assessment." (*Id.*) Thus, she urges the Court, the fact that Curp does not have similar issues with collegiality should not foreclose him from being considered similarly situated to Blessing for the purpose of determining whether she has established a prima facie case.

The Court will assume without deciding that Blessing has shown that Curp is similarly situated. While Curp's situation is not analogous to Blessing's, in the Court's view, the primary

issue is whether the University had a legitimate, nondiscriminatory purpose in terminating Blessing or whether the University acted with discriminatory animus.  Therefore, Blessing's assertion regarding her proposed comparator suffices to sustain a prima facie case.

### 2.  Legitimate, Nondiscriminatory Reason

Having concluded that Blessing has established a prima facie case, the Court also holds that the University has proffered legitimate, nondiscriminatory reasons for the non-renewal of Blessing's teaching contract.  The University's claimed reasons are threefold: (1) problems with her teaching; (2) concerns about service and collegiality; and (3) deficiencies as to her interaction with students in a personal, negative manner, as found by the Professional Ethics Committee. (Def.'s Mot. Summ. J. 29–32.)  These constitute legitimate, nondiscriminatory reasons for the non-renewal of Blessing's teaching contract because they are reasons, supported by admissible evidence, "which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action."  *Hicks*, 509 U.S. at 502, 507 (citing *Burdine*, 450 U.S. at 254–55).  Moreover, the employer need only articulate a nondiscriminatory rationale; it need not prove it.  *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (citing *Hicks*, 509 U.S. at 514).  Therefore, the University has sustained its burden of production.

### 3.  Pretext

The Court must next consider whether Blessing has produced evidence from which a reasonable jury could find that the University's asserted legitimate, nondiscriminatory reasons for the non-renewal of her teaching contract were pretextual.  Concluding that Blessing has failed to do so, the Court grants summary judgment in favor of the University with respect to Blessing's disparate treatment claim.

24

To make a showing of pretext, the plaintiff must show that the reasons given by the employer for her discharge either: (1) had no basis in fact; (2) that the proffered reasons did not actually motivate her discharge; or (3) that they were insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds*, *Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009). The plaintiff may not simply rely on her prima facie case but "must, instead, introduce additional evidence of . . . discrimination." *Id.* at 1084.

Blessing relies on the second type of showing, asserting that a reasonable jury could find that the University's proffered reasons did not motivate her non-reappointment and that the University was actually motivated by unlawful consideration of her gender. (Pl.'s Resp. to Def.'s Mot. Summ. J. 43.) Specifically, Blessing seeks to show pretext by claiming that factual disputes exist with regard to: (1) whether her teaching ratings were unduly low; (2) whether the University's reliance on her alleged lack of collegiality was in fact pretext; and (3) whether the ethics investigation actually influenced the University's decision.

Blessing claims that the first reason given for the non-renewal of her teaching contract, the University's concerns with her teaching, are pretextual. Blessing relies primarily on her 2007 student teaching evaluations and her receipt of the 2007 University Professor Award as evidence that she was similarly situated to Curp. In defense of her low PEC teaching rating that year, however—which was lower than Curp's—she simply claims that the "unwarranted low scores" given by the department chair and the PEC reviewers were "designed to mask discriminatory intent." (Pl.'s Resp. to Def.'s Mot. Summ. J. 44.) Blessing also contends that some of her negative student evaluations—particularly the one in which the student called her a "fucking bitch" and that she was "probably frigid"—were "clearly viewed by [her] colleagues as evidence

25

of poor teaching." (Def.'s Mot. Summ. J., Ex. 24.) However, these negative student evaluations were counterbalanced by many positive student evaluations, as evidenced by Blessing's receipt of the University Professor Award. Moreover, student evaluations were not a determinative factor in the PEC's annual review, or in the University's ultimate decision to not renew her teaching contract. Blessing fails to point to anything other than her own unsupported belief that would establish a factual dispute as to whether the University's concerns with her teaching are pretextual. Nor does Blessing point to any evidence to rebut the University's proffered reasons that she had considerable issues in the classroom, such as being unprepared for class, disorganized to the point of affecting performance, displaying inappropriate personal behaviors like angry and hysterical outbursts, discussing her personal issues in the classroom, and having a tendency to favor certain students. (Goda Dep. 73, 77; Jellison Dep. 7; Miner Dep. 74–75, 130; Def.'s Mot. Summ. J. 3, Ex. 1.) Blessing has failed to create a genuine issue of material fact as to whether the University's concerns with her teaching are merely a pretext for discrimination.

Blessing also claims that the second reason given for the non-renewal of her teaching contract, her lack of collegiality, is a pretext for discrimination. Specifically, Blessing asserts that the University's inconsistent application of the concept of collegiality to her and to Curp establishes a factual dispute as to whether Blessing's alleged lack of collegiality is pretextual. Blessing also maintains that collegiality could not have factored into the University's decision due to the fact that her teaching contract had been renewed in previous years. Blessing seeks further support from a proffered report by an expert on women's education equity who notes the existence of a "chilly climate" in the University's history department and how such a climate is "readily apparent" by comparing Blessing to Curp. (Pl.'s Resp. to Def.'s Mot. Summ. J., Ex. E1.)

26

However, Blessing has not presented any evidence that Curp had a similar record of issues with collegiality. Unlike Blessing, there were no incidents where Curp had engaged in non-collegial conduct with his fellow faculty members. Moreover, the fact that Blessing's teaching contract had been renewed in previous years does not preclude the University from factoring collegiality into its non-reappointment decision. Blessing received low scores for service in nearly all of her PEC evaluations during her employment with the University. In addition, the former chair of the department, Steven Miner, testified that he would have recommended non-renewal of Blessing's teaching contract long before 2008. (Miner Dep. 22–23, 99–100.) Miner met with Blessing as early as 2003 to address a number of issues with Blessing's conduct, even though he had been very much in favor of hiring her the previous year. (Miner Dep. 59, 74, 102–07.)

Blessing offers a report by Dr. Bernice Sandler, a Senior Scholar at the Women's Research and Educational Institute in Washington, D.C., with expertise in women's education equity and the presence of a "chilly climate" in institutions of higher education and policies.[15] (Pl.'s Resp. to Def.'s Mot. Summ. J., Ex. E1.) In her report, Dr. Sandler offers her opinion that a chilly climate exists in the University's history department. (*Id.*) She opines that Blessing was "subjected to a hostile and chilly climate on the basis of her gender," and as a result, Blessing was "treated differently and less favorably than her male colleagues in matters affecting her retention, promotion, and prospects for tenure." (*Id.*)

Specifically, Dr. Sandler characterizes the following as common behaviors evidencing the existence of a chilly climate in the University's history department: (1) the characterization

---

[15] Dr. Sandler uses "chilly climate" as a term that "refers to overt and more subtle forms of sexism that adversely affect the ability of women to advance in academia." (Pl.'s Resp. to Def.'s Mot. Summ. J., Ex. E1.) She explains that a variety of common behaviors "limit or inhibit the ability of women to succeed on campus," including "an unwillingness of administrators or other faculty leaders to address legitimate gender issues, a lack of respect for feminist pedagogical practices, a devaluation of the academic achievements of female faculty, and the branding of outspoken female faculty members as non-collegial." (*Id.*)

27

of Blessing as non-collegial; (2) the view that Blessing was somehow "different" than her colleagues due to her expertise in women's studies and feminist pedagogy; (3) "the unwillingness of administrators and other faculty leaders to address legitimate gender issues;" (4) the "lack of respect" for Blessing's feminist pedagogical practices; and (5) the devaluation of Blessing's academic achievements—namely, her receipt of the University Professor Award. (*Id.*) Dr. Sandler's report concludes by emphasizing that the "effect of this chilly climate is readily apparent by comparing" Blessing to Curp, whom she alleges was similarly situated, yet treated more favorably. (*Id.*) She notes that the University's use of collegiality as a justification for its decision is particularly suspect because the University did not consider collegiality in evaluating Curp's annual performance or during his tenure review. (*Id.*)

Dr. Sandler, however, having admittedly only reviewed materials provided by Blessing's counsel, fails to consider critical facts throughout her report.[16] Of the greatest concern to the Court is that the primary basis for the University's non-reappointment decision—the ethical allegations against Blessing, the subsequent investigation, and the ultimate reprimand—is not addressed anywhere in Dr. Sandler's report. At no point can the Court tell from Dr. Sandler's report that she was aware of the existence of these crucial facts. In addition, Dr. Sandler refers to the incident regarding the interview Blessing had done with the *Chronicle of Higher Education* as an example of how Blessing was "repeatedly subjected to this negative characterization [of being non-collegial] as a result of her outspoken and assertive behavior." (*Id.*) Yet the report makes no mention of Blessing's behavior after the article came out—she claimed the author had distorted her comments and told her colleagues that she would write to the author and the

---

[16] Dr. Sandler states in her report, "In connection with my analysis of this matter and in rendering my opinion, I reviewed substantial materials provided to me by Dr. Blessing's counsel." (Pl.'s Resp. to Def.'s Mot. Summ. J., Ex. E1.)

*Chronicle*, but according to them, no letter from Blessing of the kind promised ever appeared. (Def.'s Mot. Summ. J., Ex. 27.)

Federal Rule of Evidence 702 makes admissible expert testimony that is based upon sufficient facts and will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (trial court must decide whether a particular expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case"). An expert witness "is permitted wide latitude to offer opinions, including those that are based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 591. However, "expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92.

The Court is mindful that there is at least some support on the use of expert testimony regarding sex-based stereotyping, not unlike Dr. Sandler's report. For example, expert testimony regarding the existence of a chilly climate could be helpful in a hostile work environment claim. With regard to Blessing's disparate treatment claim, however, Dr. Sandler's report is not admissible under Rule 702 and the *Daubert* standard. The report is not reliable for the simple fact that Dr. Sandler did not address the ethics allegations and ultimate reprimand, which played a large role in the decision not to renew Blessing's teaching contract. Consequently, Dr. Sandler spends much of her report comparing the treatment of Blessing and Curp, alleging him to be a similarly situated, more favorably treated comparator which "reveals[s] the practical effect of the chilly climate" in the University's history department. (Pl.'s Resp. to Def.'s Mot. Summ. J., Ex. E1.) Yet, as the Court previously noted, Curp was never investigated or reprimanded for

29

unethical conduct. Without assessing the ethical allegations brought against Blessing, the subsequent investigation, and the ultimate reprimand, Dr. Sandler cannot effectively compare Blessing and Curp. There is, therefore, a "mismatch" between Dr. Sandler's knowledge and qualifications and her ability to helpfully opine on the specifics of this case. *See Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 48–49 (1st Cir. 2009) (finding "mismatch" between expert's knowledge and ability to evaluate specifics of gender discrimination case when expert had not read supervisor's deposition and was unfamiliar with supervisor's background).

Moreover, Dr. Sandler's report is filled with conclusory statements, such as "Blessing was subjected to a hostile and chilly climate in Ohio University's History Department on the basis of her gender. As a result, she was treated differently and less favorably than her male colleagues in matters affecting her retention, promotion, and prospects for tenure." (Pl.'s Resp. to Def.'s Mot. Summ. J., Ex. E1.) Legal conclusions are not a sufficient evidentiary basis to create a genuine issue of material fact. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990) (conclusory assertions about ultimate legal issues do not create questions of material fact for the purposes of a summary judgment motion). Dr. Sandler's opinion, therefore, would not assist the trier of fact in determining whether the University intentionally discriminated against Blessing on the basis of her gender and is, in this case at least, inadmissible. The Court finds that Blessing has failed to create a genuine issue of material fact as to whether the University's concerns with her service and lack of collegiality are pretextual.[17]

Before leaving this issue, the Court pauses to offer several comments. Proof of an environment "chilly" to women can be highly compelling evidence that reasons given for a

---

[17] The exclusion of the expert's report does not impact the conclusion on the summary judgment motion. The Court reaches that decision without reliance on any testimony proposed by Dr. Sandler. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 256 (1989) ("[I]t takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring 'a course in charm school.'").

termination or other adverse employment action are a pretext for unlawful, sex-based discrimination. The testimony of an expert, such as Dr. Sandler, can aid the jury in weighing the employer's true motivation. An expert must, however, have all the salient facts to offer a reliable, admissible opinion.

Blessing also claims that the third reason given for the non-renewal of her teaching contract, the ongoing ethics investigation into her conduct, is pretextual. She again claims that three of the tenured faculty members had decided against the renewal of her teaching contract before the ethics investigation even began, thereby, in her view, creating a factual dispute as to whether the ethics investigation actually influenced the University's decision. Blessing does not present any other evidence to suggest that the ethics investigation and reprimand did not play a role in her non-reappointment. She also admitted that she did not believe the ultimate report issued by the ethics committee was discriminatory or retaliatory. (Blessing Dep. 371–79.) Blessing has failed to create a genuine issue of material fact as to whether the ethics investigation and the resulting reprimand were merely a pretext for discrimination.

Finally, Blessing argues that the University's proffered reasons did not actually motivate its decision to not renew her teaching contract. Blessing contends that: (1) Goda had a negative attitude toward feminine pedagogy and gender-related courses;[18] (2) the history department was a "chilly climate" for women; and (3) Goda, in his capacity as chairperson of the department,

---

[18] Blessing identifies her teaching style as based in a "feminist pedagogy." (Blessing Dep. 56, 58–60; Miner Dep. 59–60.) She describes feminist pedagogy as a teaching approach that ideally fosters a classroom environment where students are active, engaged, and feel comfortable asking questions, including of the teacher. (Blessing Dep. 58–62.) Blessing described a specific technique she used to create such an environment: "I have the students at the beginning of class write down terms from that week's reading, lectures. One student goes to the board, and the rest of the class has to give out terms or concepts. Then that one student, whoever that student is, it is voluntary, somebody always goes up, writes down those terms or phrases or dates." (Blessing Dep. 61.) Blessing contends that the University attributes problems with her teaching—specifically, lack of organization—with her feminist pedagogical approach. However, feminist pedagogy is unrelated to classroom organization. Moreover, Blessing admits that a professor need not be female to teach from a feminist pedagogy and that a number of faculty members in the history department use or have used at least elements of such pedagogy: Gerard Sasges, Aaron Moore, Sholeh Quinn, Nicholas Creary, Miriam Sadis, Michele Clouse, and Katherine Jellison. (Blessing Dep. 64, 66.)

acted with unwarranted hostility toward Blessing. (Pl.'s Resp. to Def.'s Mot. Summ. J. 51.)  In order to succeed, Blessing must show that "the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." *Doucet v. Univ. of Cincinnati*, No. 06-4118, 2007 WL 2445993, at *6 (6th Cir. Aug. 28, 2007).

To this end, Blessing relies primarily upon statements made by Goda throughout her time at the University, contending that he played an instrumental role in limiting her career and that his discriminatory animus infected the non-reappointment decision: Goda's suggestion to use a lecture-oriented approach after a negative PEC evaluation, Goda's comment that "there is only one way to teach military history," that an "inordinate amount of the reading [for her Modern France course] comes from books on fashion, cinema, and the like," and Goda expressing to Ogles his relatively low opinion of the University Professor Award. (Blessing Dep. 98, 142–43, 160, 298–99; Ogles Dep. 75; Goda Dep. 80, Jan. 20, 2011.)

All of these remarks are isolated and gender-neutral.  They are also remote in time and unrelated to the Promotion and Tenure Committee's reappointment process and cannot, by themselves, support a finding of discrimination. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993).  Furthermore, Goda was only one of many who took part in the unanimous recommendation against Blessing's reappointment.[19]  Although this fact is not itself dispositive, Blessing has presented no evidence from which a jury could conclude that Goda sufficiently influenced the reappointment process so as to prompt the decision not to renew her teaching contract. *See Gutzwiller v. Fenik*, 860 F.2d 1317, 1327 (6th Cir. 1988).

---

[19] Although Goda, as chair of the department, wrote the letter informing Blessing of the PTC's decision to not renew her teaching contact, he did not vote in the PTC's discussions. (*See* Def.'s Mot. Summ. J., Ex. 55.)

Moreover, the Court acknowledges and adheres to the significant body of case law that emphasizes that courts are not to sit as "super-tenure committees" and substitute their judgment for that of universities, absent a strong showing of discrimination. *Doucet v. Univ. of Cincinnati*, 2007 WL 2445993, at *5 (6th Cir. Aug. 28, 2007); *see also Stein v. Kent State Univ.*, No. 98-3278, 1999 WL 357752, at *6 (6th Cir. May 11, 1999) (it is a "well-established rule that faculty members strive to reappoint individuals who are harmoniously in sync with those in the department, will make academic contributions, and eventually receive tenure"); *Gutzwiller v. Fenik*, 860 F.2d 1317, 1326 (6th Cir. 1988) (jury should not act as "super tenure committee"); *Fields v. Clark Univ.*, 966 F.2d 49, 54–55 (1st Cir. 1992) (deferring to university tenure decision process); *Jiminez v. Mary Washington College*, 57 F.3d 369, 376–77 (4th Cir. 1995) (same); *Brousard-Norcross v. Augustina College Assn.*, 935 F.2d 974, 976 (8th Cir. 1991) (same). Such a showing is not evident here.

Ultimately, Blessing's theory of gender discrimination is based primarily on her unsupported claims of gender bias at the University. That is not enough to establish pretext or to survive summary judgment. Accordingly, the Court grants summary judgment in favor of the University with respect to Blessing's disparate treatment claim.

## C. Hostile Work Environment

With respect to Blessing's hostile work environment claim, the Court notes the following history: Blessing asserted that she had been subjected to sexual harassment in her EEOC charge, but did not clearly assert a hostile work environment claim in her complaint. Though the complaint could be read in a generous way to include a hostile work environment claim, and while the University addressed the claim in its motion for summary judgment, there has been no response to it from Blessing. Given the lack of any direct reference to a hostile work

33

environment claim in the complaint, and more significantly, the lack of response from Blessing to the University's motion for summary judgment, the Court treats this claim as abandoned.

## D. Retaliation

Finally, the University argues that it is entitled to summary judgment on Blessing's disparate treatment claim. Under Title VII, it is an unlawful employment practice "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Blessing claims that the University did not renew her teaching contract in retaliation for her filing a formal grievance with the University's Office of Institutional Equity.

In the absence of direct evidence, the Court reviews Blessing's retaliation claims under the *McDonnell Douglas* burden-shifting framework. *Weigel v. Baptist Hosp.*, 302 F.3d 367, 381 (6th Cir. 2002). To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) the defendant had knowledge of the plaintiff's protected conduct; (3) the defendant took an adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (2003). A plaintiff's burden in establishing a prima facie case of retaliation "is not onerous" and is "easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

After proving the existence of a prima facie case, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Abbott*, 348 F.3d at 542. If the defendant meets this burden, the plaintiff must then demonstrate by a

34

preponderance of the evidence that the proffered reason was merely a pretext for discrimination. *Id.* Throughout the entire *McDonnell Douglas* framework, the plaintiff bears the burden of persuasion. *Hicks*, 509 U.S. at 511.

### 1. Prima Facie Case

The parties do not dispute that Blessing has established the first three elements of her prima facie case: (1) she filed a formal grievance alleging sexual harassment with the University's Office of Institutional Equity in March 2008; (2) the University knew of her doing so; and (3) her teaching contract was not renewed. The only dispute is whether Blessing has established the causal connection required under the fourth prong.

To establish causation, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct." *Weigel*, 302 F.3d at 381 (quoting *Nguyen*, 229 F.3d at 563). Although not one factor is dispositive in establishing a causal connection, a causal link may be shown through evidence that the defendant treated the plaintiff differently from similarly situated employees. *Nguyen*, 229 F.3d at 563. In addition, although temporal proximity is usually not enough to show causation, where an adverse employment action occurs very close in time after an employer learns of a protected activity, temporal proximity may be enough. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (plaintiff found to have satisfied his burden of proving causation where his employer fired him the same day it learned of his EEOC charge).

As with her disparate treatment claim, Blessing contends that she was treated differently from Curp, arguing that he was a similarly situated employee that was nevertheless permitted to go up for tenure. However, unlike Blessing, Curp was never investigated or reprimanded for unethical conduct. Nor did Curp have a similar record of issues with collegiality. The Court is

unconvinced that Blessing's assertion regarding Curp as a similarly situated comparator suffices to establish a causal connection.

Blessing also contends that the temporal proximity between her protected conduct and the University's non-reappointment decision is indicative of discrimination. The record shows that the decision to not renew Blessing's teaching contract was made three months after Blessing filed the formal grievance. The record also indicates that an e-mail from Goda to Dean Ogles was sent two months after Blessing filed her grievance, giving him the "heads up" that a vote of non-reappointment was expected. A one- to- three month time lapse has been held sufficiently close to support a finding that a causal connection exists, but "proximity alone generally will not suffice where the adverse action occurs more than a few months . . . after the protected conduct." *Hamilton v. Starcom Mediawest Group*, 522 F.3d 623, 629 (6th Cir. 2008); *see, e.g.*, *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551 (6th Cir. 2008) (period of "not quite three months" between filing EEOC complaint and termination supports an inference of causal connection); *Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006) (two months sufficient to establish causal connection). *But see Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (two to five months between filing of EEOC charge and various disciplinary actions failed to support inference of causal connection based on temporal proximity alone).

Based on the relevant case law, it is a close call as to whether the three-month period between Blessing's protected conduct and the University's non-reappointment decision suffices to establish a causal connection. The Court need not make that call today, however, because even if Blessing's is one of those few cases in which temporal proximity is enough, the University has offered legitimate, non-retaliatory reasons for its actions and Blessing is unable to show that they are pretextual.

## 2.  Legitimate, Non-Discriminatory Reasons

Assuming without deciding, then, that Blessing has established a prima facie case of retaliation, the University has produced legitimate, non-discriminatory reasons for its actions. The University claims that it did not renew Blessing's teaching contract for the following reasons: (1) problems with her teaching; (2) concerns about her lack of collegiality; and (3) deficiencies as to her interaction with students in a personal, negative manner, as found by the Professional Ethics Committee.  As the University need only articulate a nondiscriminatory rationale, the Court finds it has sustained its burden of production. *See Hartsel*, 87 F.3d at 800 (citing *Hicks*, 509 U.S. at 514).

## 3.  Pretext

Ultimately, as with her claim of disparate treatment, Blessing cannot disprove the University's proffered reasons or present evidence that they were insufficient to motivate the University's decision.  As previously noted, Blessing has not shown a genuine issue of material fact concerning the validity of the University's explanation that Blessing's contract was not renewed because of her considerable issues in the classroom, her record of issues with collegiality, and the ongoing ethics investigation and ultimate reprimand for her conduct.  Under the *McDonnell Douglas* framework, Blessing has not carried her burden of demonstrating that the University's nondiscriminatory explanations are pretextual.

Moreover, Blessing has failed to present evidence—aside from unsupported, conclusory assertions—indicating that retaliation was the true reason for the University's actions.  The Court concludes, therefore, that the University is entitled to summary judgment on Blessing's retaliation claim.

## IV. CONCLUSION

Viewing the facts and inferences in the light most favorable to Blessing, a reasonable jury could not find that the University discriminated or retaliated against her on the basis of gender. Accordingly, Defendant's Motion for Summary Judgment (Doc. 59) is **GRANTED**. The Clerk is directed to close this matter and enter judgment in favor of the Defendant.

**IT IS SO ORDERED.**

12 - 6 - 2011
_____
**DATED**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**